3. A judgment will be entered in favor of the defendant and against the plaintiff and the cause will be dismissed with prejudice at the cost of the plaintiff.

Louis Charles KING, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 73–CR–9.

United States District Court, N. D. New York.

July 29, 1977.

Henry J. Boitel, New York City, for petitioner.

Paul V. French, U. S. Atty., N. D. N. Y., Syracuse, N. Y., for respondent (Gustave J. DiBianco, Asst. U. S. Atty., Syracuse, N. Y., of counsel).

MacMAHON, District Judge.*

Petitioner, Louis Charles King, and three co-defendants were convicted, following a

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

jury verdict on March 1, 1973, of making extortionate extensions of credit and using extortionate means to collect extensions of credit, in violation of 18 U.S.C. §§ 892 and 894. Their convictions were affirmed without opinion, *United States v. King,* 486 F.2d 1397 (2d Cir. 1973), and *certiorari* was denied, 416 U.S. 958, 94 S.Ct. 1974, 40 L.Ed.2d 309 (1974).

## FACTS

The files and records of this case conclusively show the following facts and demonstrate that the actual facts are materially different from the hearsay, conclusory, speculative, spurious and distorted version set forth in the petition.

As a result of an extensive investigation into loan sharking, conducted by the Utica office of the Federal Bureau of Investigation ("FBI") under the direction of Special Agent Louis Kelly, Senior Resident Agent, petitioner King and three co-defendants were indicted on charges of making extortionate extensions of credit and using extortionate means to collect extensions of credit, in violation of 18 U.S.C. §§ 892 and 894.

Trial of the action began at Utica on February 20, 1973, and all defendants remained free on bail. At the outset, the government moved to sequester the jury, based upon a showing that sequestration was necessary to insulate the jury from anticipated prejudicial publicity and because petitioner King had made threats on the life of an FBI agent; there were plots to kill the principal witness (the victim of the loan sharking) and one of the defense attorneys, to bribe a judge and jurors, and to engage in other criminal acts, including subornation of perjury and obstruction of the trial.

The trial proceeded for three days without any extraordinary incident, but during the weekend recess, late on Saturday night, February 24, 1973, an automobile stopped in front of Agent Kelly's home; King got out, walked across the front lawn, smashed the front window and deliberately threw a hand grenade into Kelly's living room.

There was a flash, and King ran toward the automobile. Agents or police officers, on the scene guarding Kelly's home, exchanged shots. King was wounded but managed to get back into the automobile and escape. Followed, he was found some minutes later in the parking lot of the Ramada Inn, several miles away, where the jury had been sequestered since the beginning of the trial. Again, shots were exchanged; King was seriously injured and was taken to nearby St. Luke's Hospital. Another explosive device was found on his person before he was taken to the hospital.

The jury ultimately convicted King and his co-defendants on the loan sharking charges. King now petitions for habeas corpus relief under 28 U.S.C. § 2255, seeking to vacate his judgment of conviction and sentence and requesting various other forms of relief. He grounds his petition on allegations that (a) the jury was actually or possibly exposed to prejudicial publicity concerning the bombing and shooting incidents, and (b) the government agents used excessive force which deprived him of his constitutional right to be present at the trial. We deny the petition.

When court reconvened on Monday morning, defense counsel and the Assistant United States Attorney reiterated the substance of the events of Saturday night. All defendants moved for a mistrial, and King's attorney also moved for severance, stating that the physician treating King had indicated it would be at least two months before King could appear in court. We denied the motions, made a tentative finding, on the basis of the attorneys' statements and subject to a subsequent evidentiary hearing, that King had voluntarily absented himself from the proceedings, and continued the trial in his absence. We also denied counsel's motion to voir dire the jury to determine whether they had learned of the events of Saturday.

The marshal in charge of the jury had been instructed from the outset of the trial to insulate the jury from all media publicity about the case and had assured us that our instructions in that regard had been fol-

lowed. The marshal also assured us that the jury, sequestered on the opposite side of the motel from the parking lot where the shooting occurred, had not become personally aware of the fracas and had not seen or heard any publicity concerning it. The news media were, of course, aroused by the grenade-throwing and shooting incidents, and those events were widely publicized.

Counsel continued vigorously to represent King through the remaining phases of the trial. He stated that King wished to testify at the hospital in his own behalf. At counsel's request and in the presence of all counsel, we carefully interrogated King's attending physician, Dr. Millett, and visited King at his bedside to satisfy ourselves that he was able to testify and that there was nothing about King's appearance to shock or prejudice the jury. Satisfied that he could testify, we convened a special session of the court and jury in the hospital, where King testified from his bed. The jury was not told the reason for King's hospitalization; indeed, we specifically cautioned the jurors that they should not speculate as to the cause of his injuries.

The trial continued and was concluded, the jury deliberated for some thirteen hours and returned a verdict of guilty against all defendants on all counts. We denied counsel's motion for a new trial. Thereafter, we conducted an evidentiary hearing, at which an agent present at the grenade-throwing incident testified to the events already recounted. King and his codefendants declined to present any evidence but rested on the government's proof. We again concluded that King had, through his own voluntary acts, started the foreseeable chain of events resulting in his hospitalization and consequent absence from the trial. *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Diaz v. United States,* 223 U.S. 442, 445, 32 S.Ct. 250, 56 L.Ed. 500 (1912); *United States v. Tortora,* 464 F.2d 1202 (2d Cir. 1972).

We note that the incidents in question were not the first indications that efforts would be made to sabotage the trial. Although we were not originally inclined to undertake the extraordinary measure of sequestration, we concluded that sequestering the jury was appropriate for the reasons stated above and because King's attorney represented that he feared that Marrone, a severed co-defendant who would later testify at King's trial, would bring and use a gun in the courtroom.

Finally, we note that King later pled guilty to possession of the hand grenade and throwing it through Kelly's window.

## MOTION TO DISQUALIFY

We consider first King's motion to disqualify the court from consideration of this petition. King relies on 28 U.S.C. § 144, providing for disqualification where the court is personally biased or prejudiced against a party, and on 28 U.S.C. § 455, providing for disqualification where a judge may be a material witness in the proceeding. We find no cause under either section to warrant disqualification here.

Section 144 provides for disqualification of a judge whenever a party "makes and files a timely and *sufficient* affidavit that the judge before whom the matter is pending has a *personal* bias or prejudice either against him or in favor of any adverse party . . . ." (emphasis added). While a judge ruling on a motion to disqualify must take as true the allegations of the affidavit, the mere filing of the affidavit does not automatically disqualify a judge, and the judge has the duty to pass upon the sufficiency of the affidavit. *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 181 (1921). Such an affidavit will be deemed sufficient only if it gives "fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Id.* at 33–34, 41 S.Ct. at 233. The affidavit filed in this proceeding is plainly insufficient to support such a charge.

Ordinarily, an affidavit under § 144 must demonstrate a *personal* bias or prejudice stemming from an extra-judicial source. *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778

(1966). Opinions formed during the course of judicial proceedings, on the basis of evidence presented and conduct observed by the judge, are not the "personal" bias or prejudice required to disqualify. *United States v. Sclafani,* 487 F.2d 245, 255 (2d Cir. 1973); *Mirra v. United States,* 379 F.2d 782, 787–88 (2d Cir. 1967). King cites no extra-judicial, personal bias or prejudice against him.

■ King suggests that rulings adverse to him during the course of the trial present a "likelihood" that the court will not be able to assess objectively the allegations of the present petition. It is clear, however, that rulings adverse to a party are insufficient to establish judicial bias or prejudice. *Ex parte American Steel Barrel Co.,* 230 U.S. 35, 43–44, 33 S.Ct. 1007, 57 L.Ed. 1379 (1913); *United States v. Schwartz,* 535 F.2d 160 (2d Cir. 1976).

■ King also suggests that the twenty-year sentence imposed by the court and the court's comments at the time of sentencing establish the bias or prejudice necessary to disqualify. We note, however, that King was convicted of seven counts, each carrying a twenty-year maximum sentence, and that the court's imposition of concurrent twenty-year terms for each count was well under the maximum allowed by law. In *Calvaresi v. United States,* 216 F.2d 891, 900 (10th Cir. 1954), the court said:

"While the sentences imposed are very severe, they are in every instance within the legal maximum provided by statute. It cannot be said that standing alone the imposition of a sentence which the court had lawful authority to impose shows bias and prejudice."

■ Nor do the court's comments at sentencing establish a personal bias against King, as they were based entirely on the evidence presented to the court in its judicial capacity. As the court most clearly pointed out in *United States v. Bernstein,* 533 F.2d 775, 785 (2d Cir. 1976):

"The rule of law, without belaboring the point, is that what a judge learns in his judicial capacity—whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings or both—is the proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification."

That principle would apply *a fortiori* to information obtained during the course of the trial itself, all of which justified our comments and the sentence imposed on King.

■ We note, additionally, that even though personal bias or prejudice normally must derive from extra-judicial sources, contacts during a trial may create such a degree of irritation as to create the objectionable bent of mind referred to in *Berger.* See *Wolfson v. Palmieri,* 396 F.2d 121, 124–25 (2d Cir. 1968); *Rosen v. Sugarman,* 357 F.2d 794 (2d Cir. 1966). King's trial, however, is totally devoid of the kind of acrimony involved in *Rosen* and *Wolfson, supra,* where the Court of Appeals upheld the judges' refusal to disqualify themselves.

■ Finally, we see no merit in King's claim that the court should be disqualified under § 455 on the ground that the court will be a material witness in any hearing convened to determine the facts on which King's claim is based. First, we conclude that no hearing is required in order to evaluate King's legal claims, and, secondly, King's petition on its face reveals that the court has no personal knowledge of any factual matters in dispute and cannot, therefore, serve as a material witness.

Accordingly, we deny King's motion, under both 28 U.S.C. §§ 144 and 455, to disqualify the court from consideration of his petition. As Mr. Justice Rehnquist noted in *Laird v. Tatum,* 409 U.S. 824, 837, 93 S.Ct. 7, 15, 34 L.Ed.2d 50 (1972):

"Those federal courts of appeals which have considered the matter have unanimously concluded that a federal judge has a duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified.*"

## ACTUAL OR POSSIBLE EXPOSURE OF THE JURY TO PREJUDICIAL PUBLICITY

Turning now to the merits of King's petition, we note at the outset that issues arising out of this bizarre series of events have been fully litigated on at least two other occasions. First, King appealed his conviction to the Second Circuit, and the issues of possible prejudice to the jury from exposure to press coverage of the Saturday shoot-out and our refusal to conduct a voir dire were fully raised, briefed, argued and rejected by the Court of Appeals, which affirmed the convictions without opinion, 486 F.2d 1397, and the issues were then raised in King's petition for *certiorari,* which the Supreme Court denied, 416 U.S. 958, 94 S.Ct. 1974, 40 L.Ed.2d 309.

Second, on April 17, 1975, King's trial counsel, Mr. Brindisi, filed a petition under 28 U.S.C. § 2255, joined by his other co-defendants Zogby, Mazza and Talerico, in which the same issues were again raised, fully litigated and denied. It appears, however, that although King's counsel never moved formally to withdraw the motion as to King, he did write to the clerk of the court to withdraw King's petition. We did not regard that as a proper procedure and rendered our decision on September 5, 1975 denying the petition. No motion for modification of that memorandum order was made on behalf of King, nor was any appeal taken. While we feel that petitioner has had ample opportunity to litigate his contentions, we have, nevertheless, again reviewed the record in the case and the voluminous papers submitted on the instant petition, and again conclude that King is not entitled to relief.

■ Notwithstanding the prior litigation of "possible" jury exposure to publicity, King claims that there is now sufficient new evidence of such exposure to warrant complete collateral review. He requests that we hold a hearing on the issue or permit counsel to take the depositions of the jurors. This new evidence, however, is plainly insufficient to warrant such extraordinary measures.

First, King submits a questionnaire-type form document, purportedly executed by Mrs. Helen Postal, one of the petit jurors at King's trial. Mrs. Postal has check-marked a number of blanks provided on the form, allegedly indicating that she had read newspaper accounts of the trial, saw television news briefs concerning the case, and that, when the trial was convened at the hospital, she was "aware why the defendant was in the hospital at that time." The form is unsworn, contains no personal statement of facts, and the name of the county in which Mrs. Postal supposedly lives is misspelled, casting further doubt on its trustworthiness. Furthermore, even if we take the "statements" as true, they are patently ambiguous as to Mrs. Postal's actual exposure to *prejudicial* information about the case. Nowhere does the statement refer to her actual awareness, or exposure to publicity concerning the weekend incidents perpetrated by King.

Second, there is a hearsay statement by a supposed "witness" to Mrs. Postal's execution of the form, indicating the same facts contained on the questionnaire check-marked by Mrs. Postal.

Finally, King's counsel relates the substance of his conversations with Ronald Wakeel, assistant manager of the Ramada Inn, to the effect that it was *possible* for the jury to have seen media accounts of the bombing and shooting incidents, or to have heard about them on the telephone. These hearsay statements reveal no personal knowledge that the jury was exposed to publicity or other sources of information, and we note additionally that Wakeel refused to sign the affidavit prepared by counsel on the basis of those conversations.

Nearly identical arguments were raised and rejected in *People v. Manson,* 61 Cal. App.3d 102, 132 Cal.Rptr. 265 (2d Div. 1976), *cert. denied sub nom. Manson v. California,* 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977). The *Manson* case, involving the so-called "Helter Skelter" murders by Charles Manson and his "family," attracted massive local and international publicity, requiring the sequestration of the jury. Among nu-

merous other points on appeal, the *Manson* defendants claimed the trial judge erred in refusing counsel's numerous requests, both during and after the trial, to voir dire the jury concerning their exposure to publicity about the case and various other related events. The Court of Appeals upheld the judge's refusal to voir dire the jury during the trial, noting:

"The [trial] court properly denied applications of appellants' counsel to voir dire the jury to determine if it had been exposed to this publicity. The application was not supported by any showing that the court's security or jury maintenance order had been violated.

\* \* \* \* \* \*

The trial court informed counsel that it was monitoring the sequestration and was satisfied that the jurors were not subjected to news about the case. Under the circumstances the court's decision was correct. The whole purpose of the elaborate sequestration would have been frustrated if the court had been required to voir dire the jury to ask if they had knowledge of the very information that was to be kept from them. In the absence of *hard evidence* that jurors were subjected to news stories or any other information that might have been prejudicial, there was no sense in allowing a court to be drawn into a 'Catch 22.'" 132 Cal.Rptr. at 318–19 (emphasis added) (footnote omitted).

The *Manson* court similarly rejected counsel's post-trial motion for a new trial, based on counsel's declaration that one of the jurors had told him personally that he was familiar with news coverage of the trial, along with various other accounts pertaining to jury misconduct. The court again upheld the judge's refusal to voir dire the jury, holding that such hearsay and double hearsay accounts were "insufficient to impeach the verdict or to compel the court to conduct a post-verdict voir dire of the jury." 132 Cal.Rptr. at 336. Furthermore, the court held that in view of the insufficient showing, there was no need to call jurors to the witness stand to testify about those purported occurrences.

As in *Manson*, we were satisfied during King's trial, on the marshal's assurances, that our sequestration order had not been violated. There was not then, nor is there now, any "hard evidence" that the jury was in fact aware of King's extra-curricular activities. At most, the ambiguous hearsay statements now offered merely reiterate the *possibility* of jury exposure to allegedly prejudicial matters, a possibility present in any criminal trial. We do not find King's offerings here to bring his charges of jury prejudice above the level of likelihood fully presented, to no avail, to the Court of Appeals and the Supreme Court, on direct appeal.

Furthermore, an examination of the length and care of the jury's deliberations and the overwhelming evidence against King, reinforces our conclusion that the jury was not prejudiced against him. The jury deliberated for more than thirteen hours, spread over a two-day period, and made numerous requests for items of evidence, including transcripts of tape recordings introduced at trial. Those recordings were made by witness Sackman, the loan sharking victim, of conversations he had participated in with King, in which King threatened violence if Sackman did not repay the loans extended to him. The length of the jury's deliberations, coupled with its repeated requests for evidence (much of which concerned only defendant King's role in the crimes), attests to the careful scrutiny the jury gave the convincing evidence against King. We can only conclude that the jury based its verdict on careful consideration of the evidence, and in view of the strong policy against impeachment of a jury verdict, see *United States v. Crosby*, 294 F.2d 928, 949 (2d Cir. 1961), we find petitioner's evidence insufficient to mandate a post-verdict voir dire.

Finally, and most importantly, public policy and sound judicial administration require that the relief sought be denied even if King *could* demonstrate that the jury had been exposed to publicity concerning the attempted bombing and resultant shooting

of him. We are well aware of those cases holding that defendants are entitled to trials free of prejudicial effect from adverse publicity and that any extra-judicial acquisition of knowledge about the case by jurors will be deemed prejudicial unless the government can establish that it was not. See, *e. g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1964); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1964); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1953).

In our view, however, there is an important difference in this case, where King complains of the prejudicial effect of news coverage indisputably generated by his own voluntary acts of criminal misconduct during the course of his trial. Counsel have not cited, nor have we found, any reported case dealing with this precise situation. Nevertheless, we feel that this case falls well within the ambit of those cases holding, in the broadest language, that defendants may, through their own actions, waive the due process rights guaranteed by the Constitution, and that they may not, through their own actions, provoke and benefit from a mistrial.

For example, in *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Court sustained the conviction of a defendant who was removed from the courtroom because of his disruptive behavior, commenting:

> "It is not pleasant to hold that the respondent Allen was properly banished from the court for a part of his own trial. But our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. *Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him.*" 397 U.S. at 346, 90 S.Ct. at 1062 (emphasis added).

See also the concurring opinion of Mr. Justice Brennan, who wrote:

"[T]here can be no doubt whatever that the governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward.

\*    \*    \*    \*    \*    \*

To allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes." 397 U.S. at 349–50, 90 S.Ct. at 1063.

Our Court of Appeals embraced a similar notion in *United States v. Bentvena*, 319 F.2d 916, 931 (2d Cir.), *cert. denied*, 375 U.S. 940, 84 S.Ct. 345, 346, 353, 354, 355, 360, 11 L.Ed.2d 271, 272 (1963), when it said:

> "Law enforcement and fair trial for those accused of violations is not to be limited to the pattern chosen by defendants. The administration of criminal justice in the federal courts will not be delivered into the hands of those who could gain only from its subversion."

See also *Diaz v. United States*, 223 U.S. 442, 445, 32 S.Ct. 250, 56 L.Ed. 500 (1912); *United States v. Yanagita*, 552 F.2d 940 (2d Cir. 1977); *United States v. Tortora, supra*, 464 F.2d 1202; *United States v. Aviles*, 274 F.2d 179 (2d Cir. 1959), *cert. denied*, 362 U.S. 974, 80 S.Ct. 1057, 1058, 1059, 1068, 1071, 1073, 4 L.Ed.2d 1009, 1010, 1015, 1016 (1960).

Those cases, allowing a continuance of a trial in spite of a defendant's disruptive courtroom behavior or voluntary absence, convey a clear deterrent message: once a trial has begun, the court is authorized, indeed obligated, to bring that trial to a just and speedy conclusion, and the defendant will not be empowered to stop the proceedings according to his own design. A similar rule must apply here, lest we license defendants to devise even more bizarre, ingenious and outrageous methods to bring the trial to a halt or, later, to set aside the jury's carefully-considered verdict.

Reduced to essentials, King's claim here is that a defendant on trial, privileged to

remain free on bail, may engage in the most bizarre, outrageous, criminal acts, which, of course, are most likely to be newsworthy and prejudicial and may then require the court to determine that no juror was subjected to news coverage or other reports of the acts. If the court cannot so determine, the trial must be aborted and begun anew. This, in our view, would amount to a wholesale transfer of the fate of criminal trials into the hands of the most ruthless defendants, while any other defendant, content simply to appear when required and to maintain good behavior, must have his trial proceed through to conclusion.

The Court, in *Illinois v. Allen, supra*, was concerned only with scurrilous, abusive language by the defendant, which in the Court's view was inconsistent with "the decorum and respect inherent in the concept of courts and judicial proceedings." 397 U.S. at 343, 90 S.Ct. at 1061. As the Court went on to say:

> "It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes." 397 U.S. at 346, 90 S.Ct. at 1062.

In another context, commenting on a defendant's voluntary absence from his trial, the Court of Appeals for the District of Columbia said:

> "The question is one of broad public policy, whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surround him, can with immunity defy the processes of that law, paralyze the proceedings of courts and juries, and turn them into a solemn farce, and ultimately compel society, for its own safety, to restrict the operation of the principle of personal liberty. Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong."

*Falk v. United States*, 15 App.D.C. 446, 460 (1899), quoted with approval in *Diaz v. United States, supra*, 223 U.S. at 458, 32

S.Ct. 250, and in *Illinois v. Allen, supra*, 397 U.S. at 349–50, 90 S.Ct. 1057 (Brennan, J., concurring).

It cannot seriously be argued that a defendant may not avoid the consequences of a trial merely by hurling epithets at the judge, or by absconding, yet may do so indirectly, by engaging in criminal acts against a law enforcement officer outside the courtroom. In this case, King's actions at the very least were calculated to obstruct the orderly progress of justice, posed a serious threat to the very life of law enforcement officers (not to mention the public at large, since firearms and explosives were involved), and were certain to be publicized and possibly brought to the jury's attention. Indeed, but for the fact that the jurors were sequestered, it would have been a virtual certainty that they would have learned of King's activities.

It is worth emphasizing that King complains not of news coverage of his trial over which he had no control, but about news coverage of his own voluntary criminal act which, except for possible revenge, was completely unrelated to the charges for which he was on trial. On the peculiar facts involved in this case, we conclude that King cannot be heard to complain even if some publicity, or telephone reports from concerned friends and relatives, may have reached the jury. Indeed, it is but fortunate that King's own injuries and the resultant news coverage were the only consequences of King's efforts. The grenade did not explode in the agent's home, and we can only speculate as to King's intentions, or the potential consequences when he later appeared at the motel where the jury was staying, explosives and firearms in hand.

Accordingly, we find that petitioner has failed to make a sufficient showing that any prejudicial information reached the jury and that, even if it did, any such prejudice was instigated, created and caused by King's own wrongful acts, and he should not be entitled to relief from his conviction. Because the motion and files and records of this case conclusively show that petitioner is entitled to no relief, we

deny petitioner's request for a hearing or to take the depositions of the members of the jury.

## EXCESSIVE USE OF FORCE BY LAW ENFORCEMENT OFFICERS

■ Petitioner's second ground for relief need not detain us long. King claims that the FBI agents and state police who finally subdued him used excessive force, thereby unconstitutionally preventing him from attending his own trial. As noted above, it was clearly petitioner's own wilful acts that placed him in the foreseeable position of being injured by police officers attempting to prevent further violence, or to prevent his escape after committing, at the very least, an attempted assault or arson. The use of such deadly force by the officers is clearly mandated by New York Penal Law § 35.30. We found, in an opinion dictated into the record at the conclusion of the post-trial hearing, and adhere to that conclusion, that King had, through his own voluntary acts, waived his right to be present at the trial. *Diaz v. United States, supra,* 223 U.S. at 455, 32 S.Ct. 250. That conclusion is not altered by King's belated and highly doubtful suggestion that he might have been intercepted earlier, with little or no violence. Finally, out of an abundance of caution, we convened the court in the hospital, at King's request, and permitted him to testify in his own defense.

In accordance with the foregoing, this petition for relief under 28 U.S.C. § 2255 is in all respects denied.

So ordered.