**QUANTUM CORPORATE FUNDING, LTD., Plaintiff,**

v.

**ASSIST YOU HOME HEALTH CARE SERVICES OF VIRGINIA, L.L.C., Assist You Home Health Care Services of Richmond, L.L.C, Assist You Home Health Care Services of Tri-Cities, L.L.C, Nurse You, Inc., & Thomas W. Hofler, Jr., Defendants.**

No. 01 CIV. 2691(RO).

United States District Court, S.D. New York.

May 15, 2001.

Bernard Kobroff, Altieri, Kushner, Miuccio & Frind, P.C., New York City, for Plaintiff.

I. Scott Pickus, Jackson, Pickus & Associates, Richmond, VA, for Defendants.

## OPINION & ORDER

OWEN, District Judge.

Before me is Plaintiff Quantum's application for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) seeking to prevent the Defendant Assist You and Nurse You corporations from disposing of assets pledged to Quantum under two loan and security agreements dated June 23, 2000. On March 29, 2001, this Court directed the defendants to show cause as to why an order enjoining the transfer of assets should not be entered and also put a temporary restraining order in place to maintain the status quo pending a hearing on Quantum's application.[1] The parties appeared on April 19, 20 and 25, 2001 for said hearing and presented the following facts.

Quantum is a New York corporation engaged in the business of factoring[2] and commercial finance. The corporate defendants, Nurse You and Assist You, and individual defendant Hofler, are citizens of Virginia and providers of health care services. Hofler is manager of the Assist You entities and president and CEO of Nurse You. On June 23, 2000, the parties entered into two virtually identical Loan and Security Agreements, one pertaining to the Assist You corporations and the other to the Nurse You entity, in which Quantum, in its "sole absolute discretion," agreed to make loans and advances (of up to $350,000 to Assist You and $100,000 to Nurse You) against defendant's "Eligible Account" re-

---

1. The TRO prohibited defendants from paying out receivables other than in the normal course of business, such as payments for staff, telephone or rent. As I explained during the TRO hearing, my intention was to preserve the receivables balance as much as possible without shutting down the companies. This memorandum proceeds on the assumption that my order, which has been extended on consent of the defendants, has to this point been adhered to in good faith.

2. "Factoring" is "[t]he buying of accounts receivable at a discount. The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." *Black's Law Dictionary* 612 (7th ed.1999).

ceivables.[3] The agreement defined "Eligible Account" receivables at Appendix A, page S-4:

> *Eligible Account*—shall mean Accounts created by Borrower [Defendants] in the ordinary course of its business arising out of its sale of goods or rendition of services, which are and at all times shall continue to be acceptable to Lender [Quantum] in its sole and absolute discretion. Eligible Accounts shall exclude accounts that are over one hundred twenty (120) days from invoice date, contra accounts, foreign, employee and affiliate accounts, accounts with poor credit histories, excessive concentration accounts, accounts subject to cross-aging or any other accounts which do not constitute acceptable collateral to Lender. Standards of eligibility may be fixed and revised from time to time solely by Lender in its exclusive judgment. In determining eligibility, Lender may, but need not, rely on aging, reports and schedules of Accounts furnished by Borrower but reliance by Lender thereon from time to time shall not be deemed to limit its right to revise standards of eligibility at any time without notice as to both Borrower's present and future Accounts.

The Loan and Security Agreements, among other things, require that the corporate defendants pay their obligations when due (§ 10.1.1), remain solvent under a definition of solvency stated in the contract (§§ 7.1.14, 10.1.9), prepare and maintain books, records and financial statements in accordance with Generally Accepted Accounting Principles ("GAAP") (§§ 7.1.12, 8.1.3) and also prohibit the defendants from making loans (§ 8.2.2) or merging or consolidating with any other entity (§ 8.2.2).

The Agreements also established a specific manner in which Quantum could collect on its interest in defendants' account receivables because, as described by the witnesses and attorneys, Medicare regulations prohibit the assignment of claims by providers, like the defendants, to "any other person," 42 C.F.R. § 424.73. Accordingly, the Agreements established that Medicare payments to the defendants would be placed in a "lockbox" at First Union Bank in Charlotte, North Carolina in defendants' name and the contents of the lockbox would be forwarded to Quantum on a daily basis (§§ 6.2.10, 6.2.11).

Frank Madonna, Quantum's senior vice-president and officer responsible for asset-based lending, negotiated the Agreements with Assist You and Nurse You, which were represented by Hofler. He testified and introduced various documents, including the UCC-1 forms evidencing Quantum's secured interest in the defendants' receivables and filed in the Circuit Clerk's Office in Petersburg, Virginia. Prior to execution of the Agreements, Quantum discovered that defendants were in arrears on payroll taxes in the amount of approximately $80,000 and Quantum's loan in or

---

**3.** The Agreement reads, "Subject to the terms and conditions of, and in reliance upon the representations and warranties made in this Agreement and the other Loan Documents, Lender agrees to make loans and advances of up to Three Hundred Fifty Thousand Dollars ($350,000) ("Total Revolving Credit Facility") available upon Borrower's request therefore, as follows: [1.1.1.] Lender shall from time to time, in its sole absolute discretion, make loans, advances and other financial accommodations to or for the benefit of Borrower of up to 75% of the Net Amount of Eligible Accounts (or such greater of lesser percentage thereof as Lender shall, in it sole and absolute discretion, determine). Lender shall have the right to establish reserves in such amounts, as Lender shall deem necessary or appropriate against the amount of Revolving Credit Loans which Borrower may otherwise request under this subsection 1.1.1."

about July 2000 was used to pay this tax debt. Madonna testified that Quantum normally schedules an audit somewhere within the first three months of taking on a new client, however, plaintiff had trouble doing so with Hofler and the corporate defendants. Quantum was finally able to audit the defendants in October 2000 using its financial field examiner Dick Seymour of DF Flores & Associates.

Seymour reported to Quantum in the last week of November 2000 that the Assist You entities had failed to post general ledgers since September 30, 2000, the same for Nurse You since August 31, 2000, payroll taxes through November 13, 2000 were past due and no reconciliation of defendants' accounts receivables (to determine what monies had actually been collected) had been performed on the financial reports submitted to Quantum. Seymour also noted that there was no internal financial controller or outside accountant. Madonna testified that Seymour further informed Quantum that the defendants' aforementioned payroll tax liability was at that point in excess of $400,000.

Quantum was understandably concerned because defendants' payroll tax liability exceeded the amount of Quantum's loan and plaintiff, therefore, reduced defendants' available financing. It informed Hofler that, by Seymour's calculations, defendants were over-advanced on their credit by approximately $44,000. Madonna stated that he contacted Hofler, who conceded that defendants owed the taxes and that payroll would be paid as soon as sufficient funds became available. Madonna stated that approximately $16,000 of the payroll taxes were paid on January 3, 2001, but he never saw any other documents evidencing further payment of defendants' payroll liability. Madonna testified that defendants stopped furnishing Quantum financial in-

formation and lockbox payments entirely on February 15, 2001. At this time, the parties exchanged several letters declaring one another to be in breach of the Agreements.

Madonna, addressing a recent set of financials Quantum received from the defendants in connection with this Court's TRO order, concluded that defendants are insolvent as defined by the Agreements and that as of March 23, 2001, Quantum's loan statements reflect that (1) the total amount of the loan outstanding to the Assist You companies was $201,748.58, including interest from February 15 to March 23 and (2) the total amount of the loan outstanding to Nurse You was $27,988.74.

Hofler testified on behalf of the defendants. Most of his testimony centered on the process by which the corporate defendants get paid under the Medicare and Medicaid regimes. Defendants' clients are referred for community-based care from the Virginia Department of Medical Assistance Services. This government agency pre-screens the patients to ascertain whether they are eligible for Medicare and Medicaid. Upon receipt of the referral, defendants send a nurse to do an initial assessment of the patient to determine the number of hours of care necessary. Once the care hours are determined, defendants send an admissions packet, which includes the pre-screening information from Virginia and the nurse's report from the initial assessment, in order to obtain billing authorization from Medicare and Medicaid. Without such authorization, defendants are not permitted to bill for services rendered. The authorization process takes somewhere between eight to twelve weeks and Hofler stated that he had never had situation where authorization had been denied. However, defendants are obligated under Medicare and Medicaid to provide services within twenty-four hours of accepting the

patient, notwithstanding that authorization to bill remains pending. Hofler estimated that Medicare and Medicaid account for approximately 85 to 90 percent of his companies' revenues.

This delay in billing for services made up the bulk of Hofler's testimony and, in his mind, the crux of the dispute. Hofler testified that he became frustrated with Quantum because plaintiff cut back its funding to defendants based, in his opinion, on Quantum's lack of familiarity with Medicare and Medicaid and GAAP principles for the home health care industry. Moreover, Hofler testified that Quantum had previously loaned against accounts receivable that included unbilled services and had done so without complaint. As Hofler and his outside accountant testified, GAAP principles for home health care permit unbilled services rendered to be listed as accountants receivable, which are assets of the company. Since the centerpiece of these Agreements was asset-based lending—that is, lending against defendants' receivables—exactly what is an asset and what is not was an important question to Hofler and Quantum. As Hofler stated, Quantum did not believe unbilled services were appropriate assets against which to provide financing, despite the fact that such were listed on defendants' books as receivables.

All of Hofler's testimony about accounting principles and billing practices is, however, a bit removed from the real issue in this case: the relationship is governed by the written loan and security Agreements. Keeping this in mind, several undisputed facts came out at the hearing. First, the Agreements grant Quantum vast and absolute discretion to determine the amount of its loan and against which assets it would provide advances. Second, Hofler admits that defendants had incurred new (meaning after Quantum advanced money in July 2000 to pay off the $80,000 in arrears) payroll tax liability of approximately $400,000. Third, Hofler stated that defendants had several internal problems in the billing department resulting in receivables that were over 120 days and thus not considered "Eligible Accounts" under the loan Agreements, although Hofler quarreled somewhat with how Quantum computed 120 days. Fourth, defendants' outside accountant, Wayne Lee, testified that he agreed with Seymour's findings regarding defendants' failure to post general ledgers and keep accurate financial records, the arrears on payroll taxes and failure to perform reconciliations. Hofler also conceded, as did his attorney, that the companies have not been keeping accurate and reliable financials for quite some time. Indeed, Hofler blamed an internal accountant, whom Hofler terminated, for the accounting failures of the companies. These facts suggest that defendants are in breach of the loan and security Agreements or, at the very least, present sufficiently serious questions to litigate about the financial condition of the companies and the terms of the Agreements.

Turning to facts which tend to suggest that Quantum may suffer irreparable harm in the absence of an injunction, Hofler testified on cross-examination that he was formerly the president of a company called "Assist You, Inc." This company is not a party in the instant matter. However, Hofler was the largest (60 percent) shareholder in Assist You, Inc. The company was in the same home health care business as the defendants and also shared two business addresses with the corporate defendants. Hofler closed Assist You, Inc. down at some point and the company failed to pay off its creditors. Specifically, it failed to pay off its Internal Revenue Service payroll tax liability, which amounts to approximately $160,550. The IRS has filed levies against Assist You, Inc. and the

company, despite the fact that it no longer has any revenue, has been trying to settle the matter since 1995. The State of Virginia also filed tax levies on Assist You, Inc. in 1996 for approximately $37,806. Further, Assist You, Inc. left behind a number of unsatisfied judgments from entities including Richmond Temporaries, West Home Health Care. Inc., MCV Associate Physicians, Care Advantage, Inc., Robert Heff International and Terry Phillips.

Hofler professed to have no knowledge of these judgments and was often evasive when discussing the financials of his currently-owned companies (four of his thirteen companies are defendants in this case) and Assist You, Inc. Hofler is simply not credible on these issues. He was the largest shareholder of Assist You, Inc. and acknowledged that the company was closed, that he knew it had outstanding obligations and, moreover, testified that he was familiar with the legal principle that the largest shareholder in a small corporation may have personal liability for federal payroll taxes and other claims against the corporation. Knowing this, he clearly would have focused some degree of attention on whether he was going to be personally out close to $200,000 for unpaid federal and state taxes, not to mention obligations flowing from any judgments against the corporation for which he might have personal liability. On this record,

Hofler appears to have a history of making judgments uncollectible.[4]

Furthermore, having provided his adversary with a consolidated balance sheet representing total current assets, some portion of which is receivables, in excess of $800,000, Hofler attempted over several painful pages in the transcript to waffle away from that number. The colloquy went as follows:

Q. Now presently you're telling me you have over $800,000 in accounts receivable?

A. I don't know.

Q. I'll refer you to Exhibit 7 [the aforementioned consolidated balance sheet], second page. It lists current assets at $825,457.79?

A. I don't have that in front of me, so I can't respond.

The Court: Give him a copy.

A. Okay. So this line item indicates total current assets. I'm not sure what that is made up of. I'm sure a portion of it is accounts receivables, but I can't tell you exactly what that figure is made up of. It doesn't say AR. It says total current assets.

Q. Right, that's why I asked you if you know what your current receivables are. So you really don't know if you're insolvent now, is that a fair statement?

4. Numerous other pieces of information came out on cross-examination which, in the aggregate, tend to suggest to me that Hofler has sought to make himself "judgment-proof." He has opened several subsidiaries, satellite offices and shell companies all with some variation of the name "Assist You." None of the financials from these companies was included in the balance sheet provided to plaintiff's counsel, even though Hofler called some of these entities "subsidiaries." In addition, counsel elicited that Hofler's home was raided pursuant to a search warrant by a joint task FBI and IRS task force and Hofler ad-

mitted that the Agents sought documents regarding one of his other companies called "Freedom Financial," a company which has loaned money to the Assist You entities. Hofler is the manager of Freedom Financial and the company itself is owned by Midwest Capital Management (where Hofler is manager and has a "consulting agreement in place"), which is, in turn, owned by Nevis American Trust located in Nevis, West Indies. Hofler acknowledged that in some business deals, Freedom Financial charged interest of 5 percent per *month*.

A. Well, I believe the company is solvent because we're still doing business. You know, that's not even an accounting term.

Q. Can you explain why you have such a dramatic increase from 202 to 800 something?

A. Assuming your numbers are correct, any increase in account receivables can be attributed to several things, number one growth, which is what we've been in a growth phase, number two—I'm sorry?

The Court: Finish, go ahead.

A. It will be attributed to growth as a result of additional clients coming on. Current assets also would be, if I'm not mistaken, a portion of that would be unbilled charges and those unbilled charges are as a result of new patients coming in the door. It can also be a result of acquisitions that we did where we took over a company and we had to admit all of their patients, and as a result of that it created a huge current asset bucket, if you will. Then lastly, it could be contributed to just overall growth and the individuals that are in the billing department being properly focused on making sure that they are focusing on current billing as well as collections, and that's an areas that we've really been working on as a result of our growth.

Q. Are you saying then that the $825,000 includes the unbilled amounts?

A. I'm not sure. I'm just saying that it could be an asset on the books because of the fact that when we did the transaction—

The Court: Mr. Hofler, you're the CEO of this organization, right?

The Witness: Yes, sir.

The Court: Can't you do any better than that in telling us where this comes from? I mean don't you look at the books? Don't you talk? You've got managers or whatever you want to call them. Don't you know where this money is coming from?

The Witness: Well, more specifically regarding the current asset column, I'm not really sure of the detail of it, your Honor.

The Court: I know, but you're running the business. Aren't you on top of that?

The Witness: Well, it wasn't until your order that we were able to even get a financial statement done.

The Court: Forget that. You know how the business has been doing. You know where stuff is coming in. You say, hey Joe, how are we doing in this section, how are we doing in that section?

The Witness: That's correct.

The Court. Are you telling us that you don't know where the $800,000 really came from?

The Witness: I don't know.

The Court: It could be this, it could be that?

The Witness: I don't know the specifics, but I'm sure the individual who did—

The Court: No. You're the chief. You're on top of this thing. I ran a law firm for 14 years. I knew all the time where the money was coming from, who was paying me, who wasn't paying me. Otherwise you couldn't run the thing. You're telling me you don't know where this is coming from or that's coming from?

The Witness: What I do know, your Honor, is the total AR based on the reports that we submitted and I know

the total unbilled charges based on the reports that we submitted.

The Court: Is that where the $800,00 is coming from?

The Witness: I'm not real sure exactly what the $800,000 is made up of, your Honor.

The Court: Well, that's what I'm asking you.

The Witness: On the current asset line on the balance sheet, I'm not sure where that number came from.

The Court: Don't you have a curiosity?

The Witness: Oh, sure. We just, again, because of sake of time have not had an opportunity to fully analyze statements.

The Court: But as the year was rolling along, did you know this section is doing well, that section is not doing well, we've lost money here, we've lost patients there, we got new patients here? Don't you keep track?

The Witness: As far as the financial statements were concerned, over the past six months—

The Court: As far as income is concerned, how the business is doing?

The Witness: Of course. We get weekly and daily reports on that, your Honor.

The Court: So then you know?

The Witness: That's correct. •

The Court: So that's what he's asking you, where did it come from?

The Witness: I don't know where it came from on the balance sheet that was provided here.

The Court: Forget the balance sheet. Where did it come from, in fact?

The Witness: Where did the current asset line come from?

The Court: Where did those assets come from in fact?

The Witness: I can't answer the question because I don't know what this CPA firm put in that line item, your Honor, but our CPA is here.

(Tr. 237–242.) All of the foregoing testimony also comes after Hofler made assertions at the TRO hearing that the companies' receivables exceed $500,000. (TRO Hearing Tr. at 16.)

 To prevail on its claim for a preliminary injunction, Quantum must demonstrate a threat of irreparable injury and either (1) a probability of success on the merits, or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *See, e.g., Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999). Although the monetary injury claimed here usually does not constitute irreparable harm because such injury can be estimated and compensated, irreparable harm may exist where "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Id.* (internal cite omitted); *S.E.C. v. Princeton Econ. Int'l, Ltd.,* 73 F.Supp.2d 420, 425 (S.D.N.Y.1999) (same). Preliminary injunctions are therefore appropriate to thwart a defendant from making a judgment uncollectible. *See id.*

 I find that Quantum has adequately satisfied its burden. Quantum faces irreparable harm in the form of an actual and imminent threat that Hofler's companies, wrought with accounting and payroll problems, will either cease to exist by Hofler's actions of shutting them down, as he has previously done with Assist you, Inc., or go under of their own accord for failure to pay operating expenses and payroll taxes, thereby making a judgment in Quantum's favor uncollectible. Although I make no

finding with respect to plaintiff's likelihood of success on the merits, there are unquestionably sufficiently serious questions to litigate about the loan and factoring agreements, especially with regard to the ambit of Quantum's discretion in evaluating when and whether it would loan money against defendants' account receivables, Hofler's good faith and fair dealing and Quantum's good faith.

The balance of hardships also tips decidedly in Quantum's favor. First, the evidence established a continuing pattern of bad-faith by Hofler in evading creditor claims and simply winding-up companies at the first hint of financial trouble. Without an injunction, Quantum would suffer a hardship because plaintiff would not be paid monies that, it claims, are justly due and owed for financing that has already been provided. Indeed, defendants admitted at argument on the aforementioned order to show cause that they owe Quantum money under the Agreements, but maintain that this is simply a dispute about how much they owe.[5] Second, the injunction would ensure that Quantum would be paid in the future should it prevail, but it would *not* shut down Hofler's corporations. By Hofler's own admission at the TRO hearing, the hearing on this preliminary injunction and in the consolidated balance sheets defendants provided to Quantum under this Court's order, there are currently receivables substantial-ly in excess of the amount this Court will freeze enabling defendants to continue to do business and even, should they so choose, apply for financing elsewhere.

One other point bears emphasis with respect to the propriety of seizing the amounts allegedly owed Quantum. Relying on *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999), it has been argued that this Court may not issue an injunction seizing defendants' assets. In *Grupo Mexicano*, the Supreme Court held that district courts do not have the power to issue preliminary injunctions freezing a defendant's assets in order to secure a money judgment, because unsecured creditors had no such remedy at common law. *See id.* at 329–33, 119 S.Ct. 1961. However, the Court made a distinction between general, unsecured creditors and those possessing a lien or equitable interest in the property at issue. *See id.* at 324–26, 119 S.Ct. 1961. The issue in *Grupo Mexicano*, as other courts have recognized, was whether a district court has the power to enjoin assets in which the potential judgment creditor has absolutely no equitable interest. Such is not the record before me and *Grupo Mexicano* is therefore distinguishable. Aside from the terms of the Agreements creating a security interest in defendants' receivables,[6] the state UCC–1 filings perfecting

---

5. Counsel stated, "At this point, we have a contract, we have breach of the contract with each side alleging that the other party was the first one to breach the contract. Are there monies owed to Quantum by Assist You? Probably so, Judge, I would have to agree that there are. How much? I don't know." (TRO Transcript, dated April 6, 2001, at 8–9.)

6. Section 5 of the Agreement reads, "To secure the prompt payment and performance to Lender of the Obligations and satisfaction by Borrower of all covenants and undertakings contained in the Loan Documents, Borrower hereby grants Lender, a continuing security interest and Lien upon all of Borrower's property, whether now owned or existing hereafter created, acquired or arising and wherever located including: (i) Accounts; (ii) Inventory; (iii) Chattel Paper; (iv) Instruments; (v) Documents; (vi) General Intangibles; (vii) Deposit Accounts; (viii) Investment Property; (ix) Machinery and Equipment; (x) All monies and other Property of any kind now or at any time or times hereafter in the possession or under the control of Lender ....[;] (xi) All Commercial Lockboxes, all Government Lockboxes, and other accounts

Quantum's security interest[7] and the opinion letter dated June 23, 2000 by defendants' own counsel suggesting that plaintiff indeed possesses a security interest in the receivables[8]—all of which standing alone are significant distinctions from the concerns set forth in *Grupo Mexicano*—there is a strong nexus between the receivables (only a portion of which are to be enjoined) and Quantum's claims for money damages.[9] *See, e.g., Republic of Philippines v. Marcos,* 806 F.2d 344, 356 (2d Cir.1986); *State of New York v. Panex Indus., Inc.,* 860 F.Supp. 977, 980–81 (W.D.N.Y.1994).

The foregoing constitute the Court's findings of fact and conclusions of law.

Accordingly:

1. Quantum's motion for a preliminary injunction is granted.

2. Defendants are directed to deposit $229,736 plus interest since February 15, 2001 into the Court Registry Investment System forthwith.[10]

3. Quantum's previously posted security in the amount of $5,000 is to remain in place.

4. This matter is set down for an expedited trial to begin on June 25, 2001.

So ordered.

into which any of the Collections are deposited, all funds received thereby or deposited therein, and any checks or instruments from time to time representing or evidencing the same ...." •

7. Section 5.2 states, in part, "[B]orrower ... shall execute such UCC–1 financing statements as are required by the Lender and such other instruments, assignments or documents as are necessary to perfect Lender's Lien ...." The record bears out that all such documents were filed.

8. The letter states, "The security interest and lien granted to Quantum pursuant to the Security Agreement and the property described therein ... constitute a valid first perfected security interest under the laws of the Commonwealth of Virginia and the Uniform Commercial Code ... and are entitled to all of the rights, benefits and priorities provided by the UCC and with respect to the personal property described in the Security Agreement."

9. Indeed, courts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to *specific* funds, a court retains its equitable power to freeze assets. *See, e.g., United States ex rel. Rahman v. Oncology Assocs.,* 198 F.3d 489, 494–98 (4th Cir.1999) ("When the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the status quo pending judgment ...."); *National Union Fire Ins. Co. v. Kozeny,* 115 F.Supp.2d 1243, 1250 (D.Colo.2000) (noting "strong nexus between the assets enjoined and Plaintiff's claim for money damages"); *Wishnatzki & Nathel, Inc. v. H.P. Island–Wide, Inc.,* 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) (Martin, J.) (holding funds in PACA trust subject to preliminary injunction upon showing of imminent danger of dissipation).

10. Although the aforementioned cases imposed a "freeze" on assets, this record does not counsel my leaving the assets pledged under the loan and security Agreements in the hands of Hofler and the corporate defendants. As earlier observed, Hofler succeeded in closing up Assist You, Inc. and making several judgments uncollectible in addition to a substantial amount of federal and state taxes. The most prudent course, on this record, is to place the money in the Court's interest-bearing account so that the sum will be protected.