**GLOBAL TELESYSTEMS, INC., Plaintiff,**

v.

**KPNQWEST, N.V., Defendant.**

No. 01 Civ. 5909 (RO).

United States District Court, S.D. New York.

July 13, 2001.

Douglas F. Broder, Coudert Brothers, New York City, for plaintiff.

Jonathan I. Blackman, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant.

## OPINION & ORDER

OWEN, District Judge.

Plaintiff Global Telesystems (hereafter "GTS") moves for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure prohibiting defendant KPNQwest from employing, directly or indirectly, the professional services of Jeffrey H. Von Deylan as Chief Financial Officer or otherwise. I granted plaintiff's application for a temporary restraining order on June 29, 2001 based on my finding that KPNQ had prima facie violated "no-solicitation" and "no-hire" provisions in an agreement between the parties arguably resulting in imminent and irreparable harm to GTS, and held a preliminary injunction hearing on July 6, 2001 where

both sides agreed to proceed based solely on the affidavits provided to the Court.

GTS, a telecommunications company, is a Delaware corporation headquartered in Virginia. KPNQ is a Dutch corporation headquartered in the Netherlands and, by all accounts, a direct competitor to GTS. KPNQ is joint venture that was formed in April 1999 by KPN Telecom B.V. and Qwest Communications Corporation. GTS and KPNQ compete in both quality of services and products, specifically, a "[m]anaged I[P] network with a bandwidth that links approximately 50 European cities" and North America known as "Ebone." KPNQ is also a customer of GTS's "Ebone" fiber network, purchasing services to supply areas where the KPNQ network does not reach.

In connection with a possible strategic transaction between GTS and KPNQ, presumably an acquisition or merger, the parties entered into a letter "Confidentiality Agreement" dated June 18, 2000. The four page Agreement details the obligations of the parties to protect the fruits of due diligence from disclosure and also contains a "no-solicitation/no-hire" provision which states:

> You undertake that for a period of eighteen months from the date of this Agreement, neither you nor any of your subsidiaries nor your or their Representatives shall, actively solicit, interfere with, or endeavor to entice away, any person who is at the date of this Agreement, or who is during discussions between GTS and you, a director, employee, consultant or individual employed by or seconded to work for GTS or its affiliates, or offer to employ, or assist in, or procure the employment for, any such person, *provided that* this restriction shall not prevent you from employing such person who responds to a general advertisement for recruitment without any other direct or indirect solicitation or encouragement by you.

The Agreement also contemplates remedies in the event of breach:

> No failure or delay by GTS in exercising any right, power or privilege hereunder shall operate as a waiver hereof nor shall any single or partial exercise thereof preclude any other or further exercise of any right, power or privilege hereunder. You further understand, acknowledge and agree that money damages would not be a sufficient remedy for any breach of this Confidentiality Agreement by you or by any of your Representatives and that GTS will be entitled to specific performance and injunctive relief as remedies for any such breach. Such remedies shall not be deemed exclusive remedies for a breach of this Confidentiality Agreement but shall be in addition to all other remedies available at law or equity.

Finally, the Agreement is governed by New York law and contains a New York forum selection clause.

The central facts in this matter are undisputed. Jeffrey Von Deylen began working for GTS in October 1999. Previously, from June 1998 until October 1999, Von Deylen was an employee of Qwest, based in the United States, where he was responsible for the financial operations of Qwest's European subsidiaries. Mr. Von Deylen held at least two positions during his tenure at GTS, Senior Vice President—Finance and Chief Financial Officer of Ebone, GTS's most significant operating subsidiary. Von Deylen, an at-will employee, played an important role in GTS's business planning and forecasting, financial and management reporting, SEC reporting and other financial matters.

On May 31, 2001, Von Deylen submitted the following letter to GTS's Chairman and

CEO, Robert Amman, terminating his employment:

> After great deliberation, I have decided to submit my resignation. As we have discussed previously, the past few months have been very difficult and trying for me. The restructuring process and the new management changes have caused me to reflect on the longer term opportunity at GTS.
>
> I was very recently approached by Jack McMaster to join him as CFO of KPNQwest. This opportunity is very unique and satisfies a personal objective of being CFO of an outstanding company in this industry. This opportunity also gets me back to what I do best, and this is to help a management team run a business.
>
> Given the nature of this departure, I expect that a very accelerated leaving would be preferable. I would be available to work with [others] to work through any transition issues or plans as you think appropriate.
>
> I would therefore resign from all of my positions as an officer and/or director of any and all GTS and subsidiary companies with effect on June 1, 2001.
>
> I want to thank you personally for all you have done for me. I have greatly enjoyed our working relationship and I have learned a great deal about Europe and have further advanced my career.

Jack McMaster, referenced in the above letter, was at the time (and remains) the Chief Executive Officer of KPNQ.

The circumstances leading up to the submission of Von Deylen's letter merit some discussion. In late November 2000, Von Deylen, for whatever reason, became dissatisfied with his employment at GTS and submitted his resume to several executive recruiting companies (colloquially known as "headhunters"). Von Deylen states in an affidavit that he had formal interviews with other telecommunications companies, but nothing ever came to fruition. In May 2001, KPNQ engaged the services of Judi Chadaway, a London-based executive recruiter, to assist in the search for a new CFO. Chadaway told McMaster that she was aware from her contacts in the industry that Von Deylen was looking to leave GTS. McMaster stated that he knew Von Deylen from his tenure at Qwest. Chadaway suggested to McMaster that she should be "authorized to contact" Von Deylen in order to determine his interest in the position. McMaster granted such authorization and Chadaway in fact called Von Deylen, informing him that she was aware of his intention to leave GTS for a CFO position in the telecommunications industry. At a subsequent meeting between the two, she informed Von Deylen that KPNQ was seeking a new CFO. Von Deylen stated he was interested in pursuing the position and, subsequently, Chadaway set up meetings regarding the position between Von Deylen and McMaster. Von Deylen and McMaster reached an agreement which obviously resulted in Von Deylen's resignation from GTS.

GTS initiated this action on June 28, 2001 seeking, among other things, specific performance of the June 18, 2001 Confidentiality Agreement. On June 29, 2001, I granted plaintiff's application for a temporary restraining order to maintain the status quo pending a hearing on GTS's motion for preliminary injunction. As observed, I held a hearing on July 6, 2001 with both parties agreeing to proceed on the papers.

■ A party seeking preliminary injunctive relief must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently

serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *See Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 743–744 (2d Cir.2000); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Services of Va.*, 144 F.Supp.2d 241 (S.D.N.Y.2001).

■ GTS will be irreparably harmed if KPNQ is permitted to employ Von Deylen's professional services. I base this conclusion both on the explicit provision of the agreement in which KPNQ specifically acknowledged that GTS could not be adequately compensated by money damages for breach and also on common sense. Von Deylen carries in his head important corporate and proprietary information that he acquired as a fiduciary of GTS. Although he was not bound by any restrictive covenant as an at-will employee, GTS bargained explicitly to protect itself from the loss of its top level employees to KPNQ, and New York recognizes the enforceability of covenants not to solicit employees. *See Veraldi v. American Analytical Labs., Inc.*, 271 A.D.2d 599, 600, 706 N.Y.S.2d 158 (2d Dep't 2000). Despite protestations by defendant and by Von Deylen, it is unclear to me how disclosures, even inadvertent, can be prevented. Although I do not question his integrity, I believe there is a continuing danger that Von Deylen may unintentionally transmit information he gained through his association with GTS during his day-to-day contact with KPNQ. *See, e.g., Cheng v. GAF Corp.*, 631 F.2d 1052, 1058 (2d Cir.1980); *see also North Atlantic Instruments v. Haber*, 188 F.3d 38, 49 (2d Cir.1999); *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984) (per curiam). I am not satisfied on this record that Von Deylen will be able to effectively screen that part of his brain containing information which he acquired as an officer of GTS. *See Cheng*, 631 F.2d at 1058.

■ I also conclude that GTS's submissions demonstrate a likelihood of success on the merits of its contract claim. Under New York law, "[T]he initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996) (internal marks and cites omitted). "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir.1998). A contract is unambiguous if it "has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers v. Rochester Tel. Corp. Supplemental Management Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). If a contract is unambiguous, I am "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir.1993). Contractual language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. *See United States Trust Co. of New York v. Jenner*, 168 F.3d 630, 632 (2d Cir.1999).

The plain language of the no-solicit and no-hire clause admits of only one interpretation: KPNQ agreed not to solicit or hire any GTS employees unless said employees responded to a "general advertisement." Conceding, as it must, that defendant offered to employ and employed Von Deylen, KPNQ urges that Von Deylen's departure from GTS on McMaster's invitation comes

within the "general advertisement" exception. I disagree.

■ The term "general" is defined as "[t]he most usual, basic, comprehensive, or undifferentiated form or application of something, as distinguished from specialized forms . . . ." James E. Clapp, *Dictionary of the Law* 199 (2000); *see also Webster's New Collegiate Dictionary* 473 (1979) ("[N]ot confined by specialization or careful limitation"). The word "advertisement" is defined as, "[T]he act or process of advertising," or, "[A] public notice . . . [especially] one published in the press or broadcast over the air." *Id.* at 17. Given the foregoing definitions, I conclude that the plain language of the "general advertisement" exception does not apply to the facts surrounding Von Deylen's departure from GTS. The use of headhunters, no matter how widespread or acceptable in the industry, simply does not constitute a "general advertisement." Executive recruiters are special, distinct and targeted professionals, pursuing particular individuals with certain skills and not members of the general public. On this record, no headhunter was publicly disseminating information about the CFO vacancy at KPNQ. Joe Citizen was not free to open up Forbes magazine or the local newspaper, see that KPNQ was seeking a new CFO and send in his resume. That would be a general advertisement. If the parties had wished to preserve the use of headhunters, they could have contracted to do so. However, they did not and I decline to go beyond the plain language of the Confidentiality Agreement. *See Crane Co. v. Coltec Indus.*, 1999 WL 38251, at * 6–7 (S.D.N.Y. Jan. 28 1999) (Jones, J.), *aff'd,*

171 F.3d 733 (2d Cir.1999); *see also Rocchigiani v. World Boxing Council, Inc.*, 131 F.Supp.2d 527, 530–531 (S.D.N.Y.2001) (declining to read additional terms into unambiguous agreement). Thus, I conclude that GTS has demonstrated a prima facie case of breach of contract.

■ Finally, the balance of hardships tips decidedly in favor of GTS. The company's former Senior Vice President has gone to its main competitor and, as observed, carries with him intimate knowledge regarding GTS's business. Even KPNQ acknowledges that it will not be irreparably harmed, though for a slightly different reason, by his departure upon entry of this injunction. This, if anything, only leads me to the ineluctable conclusion that what is sauce for the goose is sauce for the gander.[1] In addition, KPNQ derived substantial benefit from this Confidentiality Agreement and cannot now stand before this Court and argue that portions of it are either unenforceable or non-binding. Although no strategic transaction ever transpired, KPNQ was able to canvass GTS's financials and other information. KPNQ also expressly agreed that money damages would be inadequate. Further, I observe that KPNQ appears before me with, to put it mildly, unclean hands. McMaster was clearly aware of the no-solicit and no-hire provisions of the Confidentiality Agreement. Nevertheless he authorized Chadaway to pursue the one telecommunications financial official in the world KPNQ had contracted not to approach. Troublesome is what is absent from McMaster's affidavit. He is significantly silent on his awareness or recollec-

---

1. I do not ignore the impact here of this decision on Von Deylen as an individual. Assuming the facts set forth in his affidavit are true, he was unaware of the no-solicit and no-hire provisions of his former employer's June 18, 2000 Agreement. Nevertheless, sometimes in life, a person unfortunately walks through the wrong door. Such is the case here and I decline to allow KPNQ to avoid its obligations to GTS by asserting a claim of hardship to Von Deylen.

tion of his company's agreement not to offer employment to any GTS officer for eighteen months after June 18, 2000. He also apparently acted without consulting counsel or anyone about the obvious potential applicability of the Confidentiality Agreement and now asks this Court to relieve KPNQ from its clear agreement on all sorts of *post hoc* legal grounds. The ethics of this, needless to say, are not addressed. Against this background, I conclude that the balance of the equities tip decidedly in GTS's favor.

The foregoing constitute the Court's findings of fact and conclusions of law.

Accordingly, plaintiff's motion for a preliminary injunction is granted.[2]

So ordered.

---

2. Given my ruling, KPNQ's motion to modify the temporary restraining order to permit the continued employment of Von Deylen, submitted by letter on July 12, 2001 after the injunction application was already *sub judice*, is moot.