SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

PRINCETON ECONOMIC INTERNA-
TIONAL LTD., Princeton Global
Management Ltd. and Martin A. Arm-
strong, Defendants.

Commodities Futures Trading
Commission, Plaintiff,

v.

Princeton Economic International Ltd.,
Princeton Global Management Ltd. and
Martin A. Armstrong, Defendants.

Nos. 99 Civ. 9667, 99 Civ. 9669.

United States District Court,
S.D. New York.

Oct. 28, 1999.

Carmen J. Lawrence, New York City (Edwin H. Nordlinger, Andrew J. Geist, Dorothy Heyl, Helene Glotzer, David Rosenfeld, of counsel), for Securities and Exchange Commission, plaintiff.

Dennis M. O'Keefe, Vincent McGonagle, Lawrence H. Norton, Washington, D.C., for Commodities Futures Trading Commission, plaintiff.

Alan M. Cohen, Temporary Receiver, O'Melvey and Myers, Martin Glenn, New York City, for the Temporary Receiver.

Martin P. Unger, Lawrence S. Feld, Lawrence M. Rosenstock, Niral P. Kalaria, Tenzer Greenblatt LLP, New York City, for defendants.

### OPINION AND ORDER

OWEN, District Judge.

The Securities and Exchange Commission ("SEC") alleges that Martin A. Armstrong, and his companies, Princeton Economic International Ltd. and Princeton Global Management Ltd. (collectively, "defendants") and their myriad of subsidiaries and affiliates of all stripes,[1] violated section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77g(a), and section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by fraudulently offering and selling promissory notes in the millions issued by a down-the-line subsidiary of defendant Princeton Economic International Ltd. ("PEIL"), Cresvale International, Limited (Tokyo) ("Cresvale"), to Japanese institutional investors, and misrepresenting the net asset value to the investors, thereby concealing large and mounting trading losses. The Commodities Futures Trading Commission ("CFTC") claims that defendants also violated sections 4b, 4m and 4o (1) of the Commodity Exchange Act, 7 U.S.C. §§ 6b, 6m, 6o (1), by engaging in this scheme as to futures.

In August and early September 1999, defendants began to transfer assets in an apparent effort to hide them against a day of reckoning appearing on the horizon. On September 13, 1999, Judge Kaplan of this Court granted a temporary restraining order restraining defendants from further violating securities laws, freezing defendants' assets, appointing a temporary receiver to collect the assets and report and granting other relief. However, shortly thereafter, Armstrong, with full knowledge of this order, and on the advice of at least one of his attorneys, covertly filed his own proceeding for receivers in the Turks and Caicos Islands to diminish, if not thwart, this Court's Temporary Receiver's powers and ability to act. On September 19, 1999, the Supreme Court, Providenciales, in the Turks and Caicos Islands appointed Joint Provisional Liquidators ("JPLs") of PEIL. (See infra at p. 425). As a result, this Court entered a second temporary restraining order on September 19, 1999 ordering defendants not to file any petition in bankruptcy on behalf of the corporate defendants or seek the appointment of a liquidator, receiver or other fiduciary without leave of this Court.[2] As of this moment, I have sanc-

---

1. One such company, Princeton Economics Institute, Inc., is used and controlled by Armstrong, although it may or may not be nominally owned by two of his children, one of whom is a full-time college student.

2. This TRO was further modified on September 24, 1999 to permit the JPLs to file papers or take other necessary or appropriate actions to appoint liquidators outside the United States only.

tioned an accommodation (subject to defeasance) between the Temporary Receiver and the Turks JPLs. The SEC, CFTC and Temporary Receiver now move for preliminary injunctions.

*The SEC's Motion for Preliminary Injunction*

On October 14, 1999, the SEC, PEIL and Princeton Global Management entered into a Partial Consent Judgment of Permanent Injunction. Accordingly, the SEC seeks a preliminary injunction only against Armstrong as heretofore temporarily restrained as provided in Judge Kaplan's order. This would put Armstrong under court restraint against future violations of the securities law, freeze assets, prohibit the destruction of documents and further authorize the Temporary Receiver to act as specified—except to the extent that the Memorandum of Agreement of October 7, 1999 ("MOA") is in force and modifies any provision of Judge Kaplan's and my orders.

■ In obtaining a statutory injunction, a government agency is not subject to the burdens borne by a private litigant, such as proof of irreparable injury or inadequacy of other remedies. *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir.1977). Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), entitle the SEC to a preliminary injunction upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir.1998); *SEC v. Unifund SAL*, 910 F.2d 1028, 1039–40 (2d Cir.1990).

■ The SEC contends that Armstrong violated section 17(a) of the Securities Act and section 10(b) of the Exchange Act and Rule 10b–5 thereunder, acting with scienter,[3] by making material misrepresentations (or material omissions if he had a duty to speak) or using a fraudulent device in connection with the purchase or sale of

a security. *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1467 (2d Cir.1996).

I find jurisdiction here. Defendant Armstrong's contention in his memorandum to the Court that "the Princeton Notes were issued by foreign entities outside the United States" (Def.'s Br. at 21) is patently and facially contrary to the record. A Princeton Note for $10,420,000 issued by Cresvale to Kissei Pharmaceutical Co., Ltd. bears Armstrong's signature, (Decl. of Kristine Collins in Supp., Ex. 12), and counsel's guarded protestation at the hearing of the non-authenticity of Armstrong's signature evaporates in the comparison to Armstrong's nine admittedly genuine signatures on Exhibit 9 to the same declaration. This operation was, it is clear, all one ball of Armstrong's wax. The claim in his memorandum (Def.'s Br. at 21) that he "did not participate in the offer and sale of the Princeton Notes," is specious. Further, in penning the memorandum's language, "The SEC fails to allege any participation by the defendant [Armstrong] in the offer and sale of the Princeton Notes" (Def.'s Br. at 21–22), the writer appears not to have read ¶ 12 of the SEC's complaint.

Next, the Princeton Notes are securities. Finally, there is no question that the SEC, on this record, has put before this Court documentary and other evidence which shows that Armstrong and the entities under his control, having represented that the proceeds of their note sales would be kept in segregated accounts and used to purchase conservative investments, actually lost sums in the many millions in risky currency and commodities trading, and then commingled accounts prior to subsequent transactions to cover this up. From this, it appears that he and entities under his control used thereafter-acquired investor money to pay off maturing notes fostering the appearance that all was well, and arranged for the mailing of letters to investors containing false statements

---

3. Scienter is not a requirement under section 17(a)(2) or section 17(a)(3). *Aaron v. SEC,*

446 U.S. 680, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

which overstated the net asset value of the accounts (the "NAV letters"). These misrepresentations were material, and certainly were in connection with later "sales" as the law has in mind, and their contents would have unquestionably influenced an investor's decision. *First Jersey*, 101 F.3d at 1466. The SEC's evidence also demonstrates that defendants knowingly engaged in this conduct, satisfying the scienter requirement. This evidence not only shows current violations as required by the test for a preliminary injunction, but, upon an examination of the surrounding circumstances, it warrants the conclusion of the likelihood of future violations. *See SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir.1980); *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir.1977).

Defendants have presented nothing but unsupported arguments and conjecture in their endeavor to put the foregoing in issue, and Armstrong invoked his Fifth Amendment privilege against self-incrimination to all questions on his deposition. I observe that the Court is permitted to, and I do draw an adverse inference from his refusal to testify. *SEC v. Scott*, 565 F.Supp. 1513, 1533 (S.D.N.Y.1983). Thus, on this record, the SEC has made a substantial showing of success on the merits as to both current and, if undeterred, a clear likelihood of future violations of the securities laws. The SEC's preliminary injunction against Armstrong is therefore granted in all respects. Judge Kaplan's order of September 13, 1999 continues in full force pending the submission and signing of an appropriate formal order(s) here-

after, and I observe that this Opinion and Order is in no way to be construed as in conflict with or conflicted by any other outstanding order(s) in this action. (*See, e.g.*, Partial Consent J. of Permanent Inj. as to Defs. Princeton Economics International Ltd. and Princeton Global Management Ltd. at ¶ VI).

*The CFTC's Motion for Preliminary Injunction*

■ The CFTC seeks a statutory restraining order pursuant to section 6c of the Commodity Exchange Act, 7 U.S.C. § 13a–1, freezing defendants' assets, prohibiting the destruction of, and giving the CFTC access to, defendants' books and records, and continuing the receivership. To obtain a preliminary injunction, the CFTC, like the SEC, must show a substantial likelihood of success as to both violation and repetition. *Cavanagh*, 155 F.3d at 132; *Unifund*, 910 F.2d at 1039. The CFTC alleges that Armstrong and the corporate defendants have engaged in fraud in violation of sections 4b(a)(i)–(iii) and 4o (1) of the Commodity Exchange Act and have failed to register with the CFTC as Commodity Pool Operators ("CPOs")[4] and Commodity Trading Advisors ("CTAs")[5] in violation of section 4m.

■ Sections 4b(a)(i)–(iii) prohibit any person from cheating, defrauding, or deceiving or attempting to cheat, defraud or deceive any person in connection with commodity futures trading and from willfully entering or causing the entry of any false report or record concerning such trading.

4. A CPO is defined as "any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property, either directly or though capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market." 7 U.S.C. § 1a(4).

5. A CTA is defined as any person who "(i) for compensation or profit, engages in the busi-

ness of advising others, either directly or indirectly or through publications, writings, or electronic media, as to the value of or the advisability of trading in (I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market; (II) any commodity option authorized under section 6c of this title; or (III) any leverage transaction authorized under section 23 of this title; or (ii) for compensation or profit, and as part of regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i)." 7 U.S.C. § 1a(5).

In an enforcement proceeding, the CFTC can show a violation of this anti-fraud provision by establishing that the defendant intended to make and did make a material misrepresentation with scienter. *CFTC v. American Metals Exch. Corp.*, 775 F.Supp. 767 (D.N.J.1991), *aff'd in part and vacated*, 991 F.2d 71 (3d Cir.1993); *see JCC, Inc. v. CFTC*, 63 F.3d 1557, 1565 n. 23 (11th Cir.1995) (stating that reliance is not a necessary element in an enforcement proceeding). Here, the evidence, particularly the NAV letters, supports the CFTC's contention that defendants intended to conceal large trading losses from pool participants and misrepresented the size of the remaining assets, and then knowingly made these representations to the investors in violation of section 4b of the Commodity Exchange Act.

As to the claim that defendants have violated section 4m of the Act, by failing to register as CPOs or CTAs, the CFTC presented evidence that defendants, since at least November 1997, have commingled the proceeds derived from the sale of notes to customers in a commodity pool, and that defendants and/or their agents issued trading advice and direction and maintained authority and discretion over the funds. These are functions of a CPO and CTA, respectively, and a failure to register with the CFTC constitutes a violation of section 4m.[6]

Finally, the CFTC claims that defendants have violated section 4o (1) of the Commodity Exchange Act, which prohibits CTAs and CPOs from engaging in conduct constituting a violation of section 4b(a). Section 4o (1) has some significant differences, however: it requires "use of the mails or any means or instrumentality of interstate commerce"; it concerns only CTAs and CPOs; and it does not expressly require scienter as a prerequisite for liability under section 4o (1)(B). *In re Kolter*, [1994–1996 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 26,262 at 42,198 (CFTC Nov. 8, 1994). The CFTC's evidence also complies with these additional requirements. As discussed above, the CFTC has put before me evidence that defendants have acted as CTAs and CPOs, despite their failure to register with the CFTC. The CFTC's evidence also demonstrates that defendants have used the mails and other instrumentalities of interstate commerce to defraud, specifically in mailing the NAV letters.

Again, defendants make no presentation putting in issue the CFTC's showing. Thus, on this record, the CFTC has demonstrated that there is a substantial likelihood that it will succeed in showing a current violation of sections 4b(a)(i)–(iii), 4m and 4o (1) of the Commodity Exchange Act and that the risk of repetition exists as well. The CFTC's motion for a preliminary injunction is therefore granted.

*The Temporary Receiver's Motion for Preliminary Injunction*

■ The Temporary Receiver, whose status, power and duties as provided by Judge Kaplan are confirmed and continued by this Order, seeks to enjoin defendants from filing any petition in bankruptcy on behalf of or against any of the corporate defendants, or seeking the appointment of a liquidator, receiver or other fiduciary without first seeking leave of this Court.[7] It is well established in this Circuit that a preliminary injunction requires a showing of (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions about the

---

6. Defendants claim that the evidence is insufficient to show that they were CTAs or CPOs, which would preclude the preliminary injunction. Even if I agree with this position, which I do not, the CFTC has produced evidence showing a violation of sections 4b(a)(i)–(iii) of the Commodity Exchange Act, which is sufficient to issue a preliminary injunction under section 6b.

7. It must be noted that the Temporary Receiver and the JPLs have entered into an accommodating MOA (*see supra* p. ——) which governs the relationship between them, conditions for termination, and the JPL's obligations to this Court in this action.

merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief. *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

A party can show irreparable harm by demonstrating that without the preliminary injunction, there is a substantial likelihood that the judgment will be uncollectible, so the parties can not be returned to the positions previously occupied. *Id.; see Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 85 (2d Cir.1996). Defendants' covert conduct in securing the appointment of the JPLs in the Turks and Caicos Islands to separately deal with and thus injure and frustrate this Court's Temporary Receiver not only defied this Court's temporary restraining order, but also shows that defendants have already attempted to transfer or dispose of assets. At 10:00 in the morning of Friday, September 17, 1999, this Court's Temporary Receiver, in speaking with a London lawyer for PEIL, Nigel Barnett, told him there were to be no actions or transfers in light of this Court's already-existing order, to which Barnett replied, "I understand ... we will take no actions." That afternoon, however, the Temporary Receiver learned that subsequent to that telephone call. Armstrong had obtained the appointment of the JPLs in the Turks and Caicos Islands to take possession of all of PEIL's assets and books away from the Temporary Receiver. Barnett, when confronted with this, acknowledged that *before* his telephone conversation with the Temporary Receiver, he had advised Armstrong to make the filing and Armstrong told him to prepare the papers, and he did not tell this to the Temporary Receiver when he spoke of "no actions" (*see supra* ) because Armstrong had told him not to. This conduct by Armstrong and the false statement by Barnett are more than sufficient to warrant the preliminary injunction the Temporary Receiver seeks. *Haggiag v. Brown*, 728 F.Supp. 286, 290 (S.D.N.Y. 1990). This is the kind of effort that could render an eventual judgment here unen-forceable. Thus, the Temporary Receiver has made an adequate showing of irreparable harm.

The Temporary Receiver is also likely to succeed on the merits of his claim. Again, defendants' defiance of this Court's temporary restraining order interfered with the work and responsibilities of the Temporary Receiver, if nothing else, forcing the presently-accommodating MOA with the JPLs. This blatant disregard entitles this Court to issue a preliminary injunction restraining defendants from engaging in other activities that would defy this Court and thwart the efforts and work of the Temporary Receiver. Accordingly, the Temporary Receiver's motion is granted.

The foregoing is so ordered. Any party may submit any further perceived appropriate and necessary formal order for signature on notice.