SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

PRINCETON ECONOMICS INTERNATIONAL, LTD., Princeton Global Management, Ltd., and Martin A. Armstrong, Defendants.

Commodity Futures Trading Commission, Plaintiff,

v.

Princeton Economics International, Ltd. Princeton Global Management, Ltd., and Martin A. Armstrong, Defendants.

Nos. 99CIV.9667 (RO), 99Civ.9669(RO).

United States District Court, S.D. New York.

April 22, 2002.

Martin A. Armstrong, pro se.

## OPINION AND ORDER

OWEN, District Judge.

Defendant Martin A. Armstrong[1] has moved under date of March 21, 2002 to recuse me as the Judge presiding over this civil action. He alleges various grounds. The first is the Court allegedly "authorizing a secret judicial inquisition of past conduct further ordering the withholding of all evidence gathered thereby, the use of the ancillary power of the Court constitut[ing] a non-judicial act that violates Article III." (Armstrong Moving Papers, p. 27.) Mr. Armstrong bases this claim on para. 13(b) of a certain eight page Memorandum of Agreement ("MOA") dated October 7, 1999[2] entered into and signed by the Temporary Receiver of Mr. Armstrong's companies and the off-shore Joint Provisional Liquidators ("JPLs") of Mr. Armstrong's properties, which MOA was the subject of discussion with Mr. Armstrong's counsel Martin Unger, Esq., in open court on October 14, 1999, and a copy furnished to him. Para. 13(b) of the MOA reads:

> The Receiver and the JPLs acknowledge and agree that they shall not and they shall direct their respective agents

---

1. *See S.E.C. v. Princeton Econ. Int'l Ltd.,* 73 F.Supp.2d 420, for background.

2. Exhibit C to Mr. Armstrong's moving papers.

and representatives not to provide any non-public information regarding Group[3] or its Assets to Martin Armstrong, Martin Armstrong, Jr., Victoria Armstrong, any person or entity known to be under their direct or indirect control or acting in concert with any of them, any other former officer, director or employee of PEI or PGM, unless the provision of such information is either (a) agreed to by the Receiver and the JPLs, (b) required by applicable law, or (c) required by order of Either Court.

This "secret judicial inquisition" claim as well as the other claims can be properly assessed in the context[4] of this very action against Mr. Armstrong[5] which started on September 13, 1999, when the Securities and Exchange Commission and the Commodities Futures Trading Commission (hereafter collectively "SEC") came in with an application for an order freezing the assets of Mr. Armstrong and his Princeton companies, appointing a Temporary Receiver therefor and other relief. The case was assigned to me from the wheel, but happening to be out of the Courthouse that afternoon, the application for immediate relief went to Judge Lewis A. Kaplan in Part I, who that afternoon made a number of findings including:

> It appears that Defendants, directly and indirectly, have obtained billions of dollars from investors by making materially false and misleading statements in the offer or sale, and in connection with the purchase or sale, of securities.

> \* \* \* \* \* \*

> It appears that Defendants may attempt to destroy, alter or conceal documents.[6]

(TRO, Sept. 13, 1999, pp. 2–3.)

That same first afternoon, Judge Kaplan, from a list of three names submitted by the SEC, appointed Alan M. Cohen, Esq.[7] as the Temporary Receiver of Martin A. Armstrong's companies, which authorized Cohen to take possession and control of all assets and to operate the businesses with the view towards preserving assets for potential recompense for any injury found to have been inflicted on public investors.[8]

---

3. [Footnote by the Court] "Group" is defined as Mr. Armstrong's company "PEIL and all legal entities which it controls directly or indirectly or both." (Annex A to the MOA, p. 2.)

4. As observed in *McCann v. Communications Design Corp.*, 775 F.Supp. 1506, 1524 (D.Conn.1991), a court may put "the facts alleged in their proper context and examin[e] the surrounding circumstances."

5. This assessment requires no reference to the companion criminal case pending against Mr. Armstrong before Judge McKenna, and nothing in that case enters into the Court's thinking here.

6. [Footnote by the Court]. Actual destruction did in fact shortly happen. See this Court's finding on January 14, 2000 as to computers Mr. Armstrong had been personally ordered to turn over a week earlier:

> [I]t is one thing, to hit a delete button, and it is another thing to hit another button that Xs over everything that had been in there. That happened 529 times or about. The hard drives are removed. Hard drives are destroyed by some fluid that was put in there...and there is no argument about that fact. Those computers were utterly destroyed on the way to the turnover deliberately, in my opinion.
> (1/14/00 Tr. 197.)

7. Mr. Cohen had been one of my law clerks in the years 1979 to 1981. This fact was called to the attention of Mr. Armstrong's attorneys the first time we all met and no objection was raised.

8. In early 2002, Republic National Bank pleaded guilty in this Court before Judge Casey to the criminal charge of conspiracy with Mr. Armstrong to defraud investors in this matter and thereafter, Republic being before me in one of the many related civil cases consented to pay some $600,000,000 toward restitution to injured investors. This plea is

Within days of the said September 13, 1999 takeover by the Temporary Receiver, under circumstances of relevance to the issues now before the Court—such as the different directions from which the two parties to the MOA had come,[9] the Temporary Receiver and subsequently-appointed JPLs entered into that agreement providing for how the two groups were going to conduct their various duties vis-a-vis each other to identify, recover, preserve and protect any recovered Princeton and Armstrong assets in an efficient and cost-effective manner, to maximize the recoveries of anticipated creditors in respect thereof, including any appropriate recovery from Mr. Armstrong personally. (MOA paras. 1–5.)

It is against this background, including Judge Kaplan's finding of a sufficient preliminary showing that Mr. Armstrong and his companies had obtained at least many, many millions of dollars from false statements in connection with the sale of Princeton notes and Judge Kaplan's further conclusion that a showing had been made of the risk of the destruction of

evidence, that it is obvious that the Temporary Receiver, now having established some arrangement with the JPLs, doubtless pressed for the agreement with them in para. 13(b) that neither party would reveal to Mr. Armstrong, whom Judge Kaplan had determined to be the arguable architect of this debacle, or any Armstrong family member, et al., any non-public information that they obtained in the performance of their various asset-collecting duties unless required by Order of this Court or the Supreme Court of the Turks and Caicos Islands.

The MOA, as observed, was not negotiated with Mr. Armstrong, but was presented to me for consideration during a hearing on October 14, 1999 as to the Preliminary Injunction. Mr. Armstrong had three lawyers present including Martin A. Unger, Esq. When the MOA was brought up, Mr. Unger stated that he had not seen it and said, "If your Honor considers it appropriate, since apparently this order affects Mr. Armstrong, I would like to

---

obviously not binding and I do not regard it as binding on Mr. Armstrong, and it has no effect on this opinion.

**9.** This Court's opinion in *S.E.C. v. Princeton Econ. Int'l Ltd.*, 73 F.Supp.2d 420, 425 (1999) is self-explanatory as to Mr. Armstrong's ex parte obtaining the appointment of the offshore JPLs:

Defendants' covert conduct in securing the appointment of the JPLs in the Turks and Caicos Islands to separately deal with and thus injure and frustrate this Court's Temporary Receiver not only defied this Court's temporary restraining order, but also shows that defendants have already attempted to transfer or dispose of assets. At 10:00 in the morning of Friday, September 17, 1999, this Court's Temporary Receiver, in speaking with a London lawyer for PEIL, Nigel Barnett, told him there were to be no actions or transfers in light of this Court's already-existing order, to which Barnett replied, "I understand ... we will take no

actions." That afternoon, however, the Temporary Receiver learned that subsequent to that telephone call, Armstrong had obtained the appointment of the JPLs in the Turks and Caicos Islands to take possession of all of PEIL's assets and books away from the Temporary Receiver. Barnett, when confronted with this, acknowledged that *before* his telephone conversation with the Temporary Receiver, he had advised Armstrong to make the filing and Armstrong told him to prepare the papers, and he did not tell this to the Temporary Receiver when he spoke of "no actions" (*see supra*) because Armstrong had told him not to. This conduct by Armstrong and the false statement by Barnett are more than sufficient to warrant the preliminary injunction the Temporary Receiver seeks. *Haggiag v. Brown*, 728 F.Supp. 286, 290 (S.D.N.Y. 1990). This is the kind of effort that could render an eventual judgment here unenforceable. Thus, the Temporary Receiver has made an adequate showing of irreparable harm.

have a chance to review it and maybe even oppose it." (10/14/99 Tr. 11.) The SEC provided the logical explanation why Mr. Unger had not seen it, and the Court facing time pressures involving the order for the Preliminary Injunction presented for signature (which contained the proposed approval of the MOA), the transcript reads: "THE COURT: [Addressing Mr. Unger]. I am going to sign it. It will be up to you to move to vacate [the MOA] if you find there is something in here that is improper." (*Id.* at 11–12.)

Mr. Unger was thereupon furnished with a copy of the MOA and one would assume he showed it to his client Mr. Armstrong, but in any event nothing further was ever heard from either Mr. Armstrong or Mr. Unger with regard to the MOA until February 22, 2002—twenty-eight months later—when Mr. Armstrong, now pro se, first raised the present claim that by para. 13(b) of the MOA the Court was "authorizing a secret judicial inquisition..." (2/22/02 Tr. 43–47.) The above examination establishes this as contrary to fact and the conclusion is rejected.

█ Mr. Armstrong next asserts that having sought to take Temporary Receiver Cohen's deposition as to alleged ex parte contacts Mr. Armstrong claims Mr. Cohen had with the Court, that "this court *retaliated* by closing the court and ordering the press to get out." (Armstrong Moving Papers, pp. 31–32; emphasis supplied.) What the connection is between Mr. Armstrong's deposition application and the closing of the courtroom as a claimed retaliation thereto is not explained, but at that hearing, April 24, 2000, everybody

was in the courtroom including Mr. Armstrong and his six lawyers,[10] four from the firm of Tenzer Greenblatt,[11] and his two criminal defense lawyers.

The background of the closing of the courtroom that day was that Mr. Armstrong had earlier caused to be delivered to the Court two handwritten unsworn letters.[12] In one he charged his civil lawyers, Tenzer Greenblatt, with abandoning him by failing to contact him in the Metropolitan Correction Center ("MCC") for the prior two months,[13] and in the other letter, he made the statement that Receiver Cohen and the Court had engaged in the impropriety of "numerous ex parte meetings and telephone conferences...."

Because Mr. Armstrong's basically hearsay accusations were quite derogatory to lawyers in several directions, not to mention the Court, the Court determined to explore them in a "robing room"-type setting, although using the courtroom itself because of the substantial number of persons involved. The courtroom deputy put a sign on the courtroom door that the courtroom was closed. One reporter appeared, Noelle Knox, from the Associated Press, who inquired as to this and was advised it was a closed session. The Court is not aware she protested, and she, Ms. Knox, obviously received full access to the transcript of the session, for three days later she reported the proceedings that day having also interviewed Mr. Armstrong. (Exh. J to Armstrong Moving Papers).

At the outset addressing the charge of "retaliating" against Mr. Armstrong by

---

10. Lawrence S. Feld, Martin P. Unger, Ira Finkelstein, Niral P. Kalaria, Martin J. Siegel and Steven Legon.

11. Sometimes called Blank Rome Tenzer Greenblatt.

12. One was delivered by his criminal defense lawyer Mr. Siegel.

13. The exact language of his letter is: "I had no contact with Tenzer Greenblatt for nearly two months." (4/24/00 Tr. 6.)

closing the courtroom for the hearing, it is to be observed that at the time none of Mr. Armstrong's several lawyers or Mr. Armstrong himself questioned or complained about the closed courtroom. Nor is there any claim by any lawyer or Mr. Armstrong that anything was omitted from the transcript, and as observed, the press did get hold of it and promptly reported it.

As to the proceeding that day itself, the transcript at the beginning in relevant part reads as follows:

THE COURT: [W]e are here because of two handwritten letters of Mr. Armstrong's to me.... Mr. Armstrong has, by his criminal counsel, Mr. Siegel,[14] had delivered to me a letter dated April 13, 2000.... Now, Mr. Armstrong...I don't believe that I am required to deal with your letter at all, unless it is before me in competent form, and by that I mean that either you have put it in an affidavit form, which you did not, or you take the witness stand here under oath and testify to the accuracy of the contents. If you do that, I then have it competently before me. Without that, I merely have a letter, which is unsworn and in my opinion not competent to raise the issues that you seek to raise.

\* \* \*

THE COURT: Mr. Armstrong, do you want to—you do not have to, I observe to you this, you do not have to take an oath and swear to the truth of the contents. I would observe to you that if you don't, I am going to treat it as a nullity before me, and then on the record that I have, I will go from there.

\* \* \*

MR. ARMSTRONG: Your Honor, if I'm taking an oath and you want to question me on the limited issue of this particular letter, that is fine.[15]

(4/24/00 Tr. 3–5.)

Prior to that day, having received Mr. Armstrong's letters and being concerned

14. [Footnote by the Court]. Mr. Siegel was present, sitting in the back, and so that he could participate, the Court suggested he sit in the jury box, which he did. (4/24/00 Tr. 7.)

15. [Footnote by the Court]. None of Mr. Armstrong's counsel present, civil or criminal, objected to him testifying.

16. Indeed Mr. Armstrong abandoned his claim of abandonment, testifying:

with regard to the claim of client abandonment against Tenzer Greenblatt, the Court, as the transcript reads at p. 13, obtained from officials at the MCC a list of visits by lawyers to Mr. Armstrong in the period in question. According to the list, Mr. Armstrong in the prior six weeks had received 28 attorney visits. Mr. Armstrong, when shown the said MCC report at the hearing, did not accept the total number of visits, but did acknowledge that "[t]here are a number of attorneys that have come to visit me," including his criminal defense lawyer Martin Siegel and Mr. Siegel's assistant Mr. Legon. (*Id.* at 13.) He also in his testimony—notwithstanding his letter in which he stated he had had *no* contact with Tenzer Greenblatt for nearly two months (*id.* at 6), acknowledged there were *three* visits by Tenzer Greenblatt lawyers and possibly one more in that period. (*Id.* at 8.) Mr. Armstrong at no time in his testimony before me set forth any matter that any lawyer on his behalf had failed to do anything about except problems with a workable tape player and earphones in the MCC so that he could listen to some tapes, and as to this, it was acknowledged that his criminal attorney Mr. Siegel was dealing with this problem and that the Court had also intervened to help solve it. (*Id.* at 19–20.) Accordingly, the transcript sets forth the Court's conclusion that day that there was no basis for his claim of abandonment by Tenzer Greenblatt. (*Id.* at 23.)[16]

THE WITNESS: Precisely what those dates are, your Honor, I do not know. The two-month reference there, I believe, came from the transcript. So the first time that Mr. Unger came to visit me, I do not know the precise date, if it was less than two months or if it was greater than two months.

THE COURT: Let me ask you this. You know, you don't mention any of this in the letter. And I take it this let-

▮ Finally, Mr. Armstrong in his second letter, which the Court considered that day, had renewed his assertion that "...you [the Court] have engaged in numerous ex party meetings and/or telephone conferences with your former law clerk, Mr. Alan Cohen." (*Id.* at 27.) This was explored with Mr. Armstrong by the Court on the stand under oath. At this point, the transcript needs to be extensively quoted to show the vacuity of this claim.

THE COURT: Let me hear you address yourself to something specific. Your letter starts off, "It has been brought to my attention that you"—that means me, the Court—"have engaged in numerous ex parte meetings and/or telephone conferences with your former law clerk, Mr. Alan Cohen." Now, where did you get that?

MR. ARMSTRONG: In part from the record itself, your Honor, that—

THE COURT: What record?

MR. ARMSTRONG: Pardon me?

THE COURT: What record? Where can you point to a record that says that?

MR. ARMSTRONG: That Mr. Cohen was appointed ex parte as the receiver over a hundred-and-some-odd companies.

THE COURT: Yes, that was by Judge Kaplan.

MR. ARMSTRONG: No, by you, your Honor.

THE COURT: Not me.

MR. ARMSTRONG: From my understanding, Judge Kaplan appointed him over PEI and PGM. Subsequently he—

THE COURT: I see.

MR. ARMSTRONG: —he met with you.

THE COURT: That was here.

MR. ARMSTRONG: Yes, I believe one or two days before I was incarcerated, I think, or maybe around very early January, there was an ex parte appointment of Mr. Cohen over all the individual PGM companies.

THE COURT: That was done, if I remember—

MR. ARMSTRONG: In early January, I thought.

THE COURT: —on the submission to me of a proposed order, with copies to everybody, I am confident.

MR. ARMSTRONG: From the information I had, Mr. Unger said he was not noticed on that.

THE COURT: Who told you that?

MR. ARMSTRONG: Mr. Unger told me that we were not noticed.

THE COURT: "Numerous ex parte meetings." Did Mr. Unger tell you that I had an ex parte meeting?

MR. ARMSTRONG: I am just referring to that one in particular, your Honor.

THE COURT: No. I'm asking you, did he tell you that I had ex parte meetings with Mr. Cohen?

MR. ARMSTRONG: I have been told that Mr. Cohen views that he has the right to go ex parte to the Court—

THE COURT: Who told you that?

MR. ARMSTRONG: Your Honor, I think it was Tenzer Greenblatt who had told me along those lines, and I think Mr. Siegel referred to it.

THE COURT: That doesn't give me a name and it doesn't satisfy me. Who told you? What person told you?

MR. ARMSTRONG: I believe it was at the meeting I had at the MCC. It was brought up in a discussion, I believe, by Mr. Finkelstein or Mr. Kalaria, and Mr. Sjoblom was there—that there was some discussion as to the receiver's position of ex parte meetings, that he had—was either reporting or something to that degree, which was the purpose of why I wanted to find out exactly what is going on.

THE COURT: I'm looking at language that says, "You," the Court, "have engaged in numerous ex parte meetings and/or telephone conferences." Was that said to you at any time?

MR. ARMSTRONG: And, also, information was given to me that Mr. Howard Burns, I think it is, or the lawyer who represented Pelletieri, Rabstein, and Altman, made the same comment as to telephone conversations that your Honor and Mr. Cohen were on together and then called him to be joined on the conference calls and that he had the impression that—

ter is written after three visits, and you never mentioned any of this at all. Right?

THE WITNESS: I believe this letter may have been written before the last visit. Or, no, maybe it wasn't. Maybe it was not. No, your Honor. I mean, in a letter to your Honor, I didn't

think it was necessary to go into extreme detail. I thought you would have a hearing on it. And I thought that was the purpose of hearings.

(4/24/00 Tr. 9.)

THE COURT: I am going to direct that Mr. Burns is ordered to come to this court and back that up.

MR. ARMSTRONG: This is information that I heard, your Honor, not directly from Mr. Burns -

THE COURT: From Mr. Burns?

MR. ARMSTRONG: Not directly from Mr. Burns.

THE COURT: Then I cancel that order.

MR. ARMSTRONG: I did not speak to Mr. Burns.

THE COURT: You said that was the source of your information.

MR. ARMSTRONG: I said this was information of comments that I had heard from other lawyers at this table—

THE COURT: Who?

MR. ARMSTRONG: —who told me that that has been the case.

THE COURT: Who?

MR. ARMSTRONG: I don't specifically remember which lawyer, your Honor.

MR. UNGER: Your Honor—

THE COURT: But it's all unattributed hearsay, is it not?

Mr. Unger, do you want to say something at this point?

MR. UNGER: I might be able to clarify some of this. There was a rumor that we had heard about something like that. I spoke to Mr. Burns to determine whether it was accurate or it was inaccurate, and Mr. Burns assured me that it was inaccurate and that there was nothing to back that up at all. So we did hear it, and we did—you know, I did follow up on it, to determine whether there was anything there.

THE COURT: Mr. Armstrong, is that the high-water mark of your position?

MR. ARMSTRONG: Your Honor, if the Court is representing that there was not an ex parte appointment—

THE COURT: I am not going to represent anything. I am not going to act on this letter, because you have put nothing competent before me.

THE WITNESS: Your Honor, I was under the impression that Mr. Cohen went to the Court ex parte to have himself appointed receiver over numerous PGM companies, companies in Europe, companies in Australia that were not named by Judge Kaplan, that there was not a hearing on it, and that it was supposed to have been ex parte.

THE COURT: It was an order that was served upon everybody, was it not?

MR. ARMSTRONG: Not to my knowledge.

MR. COHEN: The January 6th order, your Honor, everybody got it. There was actually discussion in court about the issue. And counsel objected to it. And the order, if your Honor will recall, clarified Judge Kaplan's order as to those companies that were within the ambit of PEI and PGM and attempted to set forth, in writing, on papers submitted, not on some ex parte basis, not on some phone call, not on anything else, on the papers, to define the companies that were within the ambit of Judge Kaplan's order.

And for the record, of course, Judge Kaplan made the appointment [of me] on the request of the CFTC and the SEC, and I wasn't in the room, I wasn't in the courthouse, or in the state.

THE COURT: OK. Mr. Armstrong, is that not your high-water mark?

MR. ARMSTRONG: Your Honor, I have no transcripts of any meeting in court on January 6. I would respectfully request the court clerk if he would at least deliver transcripts of all the court sessions to the MCC, I would greatly appreciate it. If there was such a meeting that I was not at and I was not aware of, I would appreciate requesting the Court to have all transcripts of sessions. And I think that will ensure that I am not under any misinterpretations in the future.

\* \* \*

THE COURT: I have nothing before me raised by the letter of April 17, 2000, and therefore I decline to explore it any further. There being nothing raising an issue that needs to be addressed as to your formal request of a subpoena of Mr. Cohen to appear at MCC for a deposition, that request is denied.

(*Id.* at 27–33.)

Given the foregoing, there is no basis for Mr. Armstrong's hearsay accusation of "retaliation" against him by the Court and the claims of ex parte communications between the Court and the Temporary Receiver having evaporated, the ruling above denying a deposition of Mr. Cohen on that subject does not require me to recuse myself to be a witness in this case as Mr. Armstrong contends at p. 30 of his moving papers.

Finally, Mr. Armstrong asserts at the close of his papers:

It is also clear that the use of a former law clerk acting as the Receiver in a case and also as judicial inquisitor and prosecutor, given the continuance of this indefinite contempt based solely upon *his* unspecified allegations arising from this judicial inquisition (*1/7/02, p. 17, L5–6*), does not comport with the appearance of impartiality commanded by *28 USC § 455* or *§ 144*.

(Armstrong Moving Papers, p. 35; emphasis supplied.)

Particularly focusing on Mr. Armstrong's claim that the continuance of his "indefinite contempt" being based solely on the Receiver's "unspecified allegations," no more need be said as to that than to refer to the recent opinion of the Second Circuit, dated March 18, 2002, *Commodity Futures Trading Commission, et al. v. Martin A. Armstrong, et al.,* 284 F.3d 404 where that Court noted that Mr. Armstrong was in jail in civil contempt for failing to turn approximately $14.9 million worth of specific corporate assets to the Temporary Receiver, and, that Court, in permitting his incarceration to continue, further observed:

> True, Armstrong has been confined for more than two years, but the length of his confinement must be viewed in the light of the value of the concealed property, which is unusually great.
>
> \* \* \* \* \* \*
>
> With the dismissal of the instant appeal, Armstrong will for the first time be faced with the prospect of indefinite confinement.

284 F.3d at 406.

The above disposes of Mr. Armstrong's claim of "indefinite contempt based solely upon [the Receiver's] unspecified allegations...." [17]

Finally, under the authorities, the Court (or any other Judge on the Court, should referral be required) need only respond to facts asserted by Mr. Armstrong that evidence some personal bias or prejudice,[18] "not merely adverse rulings." The facts dealt with above are basically four: (1) "the secret judicial inquisition," which was not that at all but a para. 13(b) of the MOA between the Receiver and the JPL's incorporated into the preliminary injunction to take the proceeding forward; (2) the allegation that the Court put Mr. Armstrong in prison "for disgorgement—for something I have no notice of whatever[,]" which is refuted by the Court of Appeals opinion of March 18, 2002, *supra,* that Court observing he had full notice certainly by August 25, 2000; (3) the claim that the Court on January 7, 2002 failed to respond to a request for discovery as to the withholding of evidence flowing from the "secret judicial inquisition" (*see* (1) above), whereas in fact the discovery Mr. Armstrong was asking for that day (*see* Armstrong Moving Papers, p. 30) pertained to something completely different, to wit, the Receiver's investigation leading up to the Receiver's recommendation that the Court accept the Republic settlement, *supra;* [19] and (4) the closing of

---

17. Mr. Armstrong's closing argument that in the Court of Appeals mandate of March 6, 2002 in *In re: Martin A. Armstrong, Petitioner,* 02–3007 (Exh. I to Armstrong Moving Papers) the Court of Appeals found his "allegations...clearly sufficient" to require the District Court to select a new judge from the wheel in "my presence and in the presence of the media..." (Armstrong Moving Papers, p. 36), is a misreading of the said mandate which was observing as a procedural matter that to the extent Mr. Armstrong was seeking recusal and reassignment before it, the Court of Appeals, that motion was denied because any such motion must first be made in the District Court and had not been.

18. *Wolfson v. Palmieri,* 396 F.2d 121, 125 (2d Cir.1968).

19. Even here, the request for the results of that investigation, the record shows, concerned matters that had already been furnished him, the Receiver, stating:

> If Mr. Armstrong again thinks we have made a mistake based on the information that he's got, which documents were contained in the documents given to him and also some of the information in the receiver's report which he has had for a long time, he obviously is free to point out any errors that we have made in that connection.

the courtroom on April 24, 2000, as a alleged retaliation by the Court.[20] None of the foregoing facts evidence personal bias or prejudice (or "partiality" as Mr. Armstrong suggests on p. 35 of his Moving Papers, where he refers to 28 U.S.C. § 455).

■ Given this, there is no requirement under 28 U.S.C. § 144 that this matter be assigned to another judge to hear,[21] and indeed, a claim of personal bias or prejudice may be explored by the challenged judge *ab initio*,[22] and if, as here, it be found on examination to be factually and legally "[in]sufficient",[23] a judge has a duty *not* to disqualify himself.[24] Here the Court's actions have at all times been solely motivated and occasioned by what the Court has learned from its participation in this case, and from nothing else. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

Mr. Armstrong's motion to recuse is denied.

So ordered.

(1/7/02 Tr. 27.)
To the above Mr. Armstrong thereafter made no response.

20. The Court observes, but does not need to reach the arguably dispositive issue of the substantial untimeliness of the assertion of the above claims as a basis for recusal, even if, they were otherwise "sufficient" as the statute requires. *McCann v. Communications Design Corp., supra* at 1524.

21. *In re Martin–Trigona*, 573 F.Supp. 1237 (D.Conn.1983), *appeal dismissed*, 770 F.2d 157, *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592,

22. *King v. United States*, 434 F.Supp. 1141, 1144 (S.D.N.Y.1977).

23. 28 U.S.C. § 144.

24. *United States v. Pastor*, 419 F.Supp. 1318, 1332 (S.D.N.Y.1975).